UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
ASHLAND DIVISION


IN RE:

HNRC DISSOLUTION CO. f/k/a
HORIZON NATURAL RESOURCES
COMPANY, et al.

DEBTORS                                              CASE NO. 02-14261
                                                     CHAPTER 11


GEOFFREY L. BERMAN, solely in his
Capacity as the Liquidating Trustee of the
HNR Liquidating Trust                                PLAINTIFF


VS.                                                  ADV. NO. 04-1164


PALISADE CONSTRUCTORS, INC.                          DEFENDANT

**MEMORANDUM OPINION**

The Defendant herein has filed a Motion for Judgment on the Pleadings and/or for Summary Judgment pursuant to Federal Rules of Bankruptcy Procedure 7012(b) and/or 7056, and Federal Rule of Civil Procedure 12(c).  The Defendant maintains that there are no genuine issues of material fact in regard to the claims against it, and that it is entitled to judgment as a matter of law on all affirmative defenses raised in its Answer and set forth in the memorandum and exhibits accompanying its motion.  The Plaintiff has filed a memorandum in response and the Defendant has replied.  This court heard the matter on March 2, 2005, and it is now submitted for decision.

1

1. <u>Factual and procedural background</u>

The Plaintiff filed his Complaint to Avoid and Recover Preferential Transfers on November 9, 2004. Therein at Count I he alleges that one or more of the liquidating debtor entities, in this instance Bowie Resources, Inc. ("Bowie"), made transfers totaling $1,224,928.28 to or for the benefit of the Defendant within 90 days of the petition dates, November 13 and 14, 2002. He further alleges that the transfers are avoidable pursuant to Bankruptcy Code section 547(b), and that the transfers are recoverable from the Defendant as initial transferee pursuant to Bankruptcy Code section 550(a)(1). The Plaintiff has withdrawn Count II of the Complaint, which sought to avoid transfers during the period 180 days prior to the filing of the petitions pursuant to Bankruptcy Code section 544(b) and KRS 378.060.

Count III of the Complaint seeks disallowance of claims pursuant to Bankruptcy Code section 502(d), which provides in pertinent part that "the court shall disallow any claim of any entity from which property is recoverable under section . . . 550 . . . of this title or that is a transferee of a transfer avoidable under section . . . 547 . . . of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section . . . 550 . . . of this title."  11 U.S.C. § 502(d). Count III alleges that any claims asserted by the Defendant in this case should be disallowed until full payment and/or turnover of the amounts of the transfers are made to the Plaintiff.

The Defendant filed its Motion for Judgment on the Pleadings and/or for Summary Judgment on January 27, 2005. Therein it sets out that the Defendant is a Colorado corporation in the commercial

2

construction business.  Bowie entered into a contract ("the Contract") with the Defendant to construct railroad track to one of its mines in Colorado.  The total contract amount was estimated to be $2,041,876.65.  Payment under the Contract was to be made upon the Defendant's submission of monthly invoices or pay requests for work performed in the prior month.  Bowie agreed to pay 90% of each pay request within 30 days of receipt.  The other 10% was to be paid within 30 days of completion and acceptance of the project.

The Defendant began construction of the project on February 18, 2002, and completed all work on or about August 30, 2002.  Seven pay requests were submitted pursuant to the contract terms from February to August 2002.  Pay request number 6 for $614,160.88 was made on July 25, 2002, and paid on August 29, 2002.  Pay request number 7 for $610,767.40 was made on August 23, 2002 and paid on September 25, 2002.  These two payments are the subject of the Plaintiff's Complaint.

On November 14, 2002, the Debtors moved the court for authority to continue to pay critical trade vendors.  The motion defined "Trade Claim" as "any claim of any person or entity against the Debtors for good provided and/or services rendered by said person to the Debtors in the ordinary course of business prior to the Petition Date."  A "Critical Trade Creditor" was defined as "any party which holds a Trade Claim and which provides goods or service that are essential to the Debtors' continued operation and for which no alternate supplier is available without significant expense."  An order sustaining this motion was entered on January 13, 2003.

The Defendant further represents that on November 22, 2002, it

gave Bowie written notice of its intent to file a lien statement pursuant to section 38-22-109(3) of the Colorado Revised Statutes. On December 4, 2002, the Defendant filed a lien statement for the remaining retention earned in the amount of $237,528.00. On February 14, 2003, Bowie tendered to the Defendant a document entitled "Agreement: Payment of Some Pre-Petition Amounts." The Defendant represents that the agreement was authorized by the court's order of January 13, 2003 in regard to Critical Claim Creditors, that it accepted the agreement, and that the Debtors made payments on the retention amount still owed, less $528.00. On June 8, 2003, the Debtors paid the Defendant the final sum of $61,714.00, and the Defendant released its lien on June 11, 2003.

2. Legal discussion

Although the Defendant has styled its motion as one for judgment on the pleadings or, in the alternative, for summary judgment, it has argued the motion as though for summary judgment and the court will treat it as such.

a. The summary judgment standard

Federal Rule of Civil Procedure 56(c), made applicable in bankruptcy by Bankruptcy Rule 7056, provides that summary judgment is appropriate and "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court has observed that

> this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported

> motion for summary judgment; the requirement is
> that there be no genuine issue of *material* fact.
> As to materiality, the substantive law will
> identify which facts are material.  Only disputes
> over facts which might affect the outcome of the
> suit under governing law will properly preclude
> the entry of summary judgment.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248, 106 S. Ct. 2505, 2510 (1986)(emphasis in original).

The summary judgment standard is set out in *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 2552-53 (1986):

> [T]he plain language of Rule 56(c) mandates the
> entry of summary judgment, after adequate time
> for discovery and upon motion, against a party
> who fails to make a showing sufficient to
> establish the existence of an element essential
> to that party's case, on which that party will
> bear the burden of proof at trial.  In such a
> situation, there can be "no genuine issue as to
> any material fact," since a complete failure of
> proof concerning an essential element of the
> nonmoving party's case necessarily renders all
> other facts immaterial.

The Sixth Circuit has opined that "[r]ead together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989).

b.  <u>Insolvency</u>

The Defendant argues that the Plaintiff cannot prevail on his allegation of preferential transfers pursuant to Bankruptcy Code section 547(b((3) because the debtor entity Bowie was not insolvent at the time of the transfers.  In support of this contention, the Defendant states that Bowie's amended schedules as of November 14, 2002 showed assets of $32,969,741.15 and liabilities of

5

$28,944,032.27. The Defendant contends that this representation, along with what it characterizes as Bowie's history of timely payments, is sufficient to rebut the presumption of insolvency set out in Bankruptcy Code section 547(f).

The Plaintiff's response to this contention is to point out that at the time of filing of the Chapter 11 petitions, the Debtors were burdened with over $1.1 billion in secured debt. The Plaintiff recites the details of the three tiers of secured debt, including $250,000,000.00 to Deutsche Bank Trust Company Americas, the pre-petition senior secured lender which had a validly perfected, first priority lien on substantially all of the Debtors' assets, $465,000,000.00 in second-tier notes, and $450,000,000.00 in third-tier notes. The record shows that each Debtor guaranteed the repayment of all three tiers of secured debt, and that all their assets were given as security. The Defendant therefore cannot overcome the presumption of insolvency.

      c.    <u>The Defendant as secured creditor</u>

The Defendant argues that it had a validly perfected lien on Bowie's property at the time of the transfers, and that its lien is one of those addressed in Bankruptcy Code section 545(2) which provides in pertinent part that "[t]he trustee may avoid the fixing of a statutory lien on property of the debtor to the extent that such lien is not perfected or enforceable at the time of the commencement of the case against a bona fide purchaser. . ." 11 U.S.C. § 545(2). Further, Bankruptcy Code section 546 provides for limitations on the trustee's avoiding powers, specifically section 546(b)(1)(A) which provides that "[t] rights and powers of a trustee under sections 544,

545, and 549 of this title are subject to any generally applicable law that permits perfection of an interest in property to be effective against an entity that acquires rights in property before the date of perfection." 11 U.S.C. § 546(b)(1)(A).

The Defendant filed a notice of its intent to file a lien statement pursuant to section 38-22-109(3) of the Colorado Revised Statutes on November 22, 2002; on December 4, 2002, it filed its lien statement. Both of these dates are post-petition. The Defendant maintains, however, that it was the holder of a statutory lien that had the right to perfect the lien at the time the case was commenced. Section 38-22-101 of the Colorado Revised Statutes provides:

> Every person who furnishes or supplies laborers, machinery, tools, or equipment in the prosecution of the work, and mechanics, materialmen, contractors, subcontractors, builders, and all persons of every class performing labor upon or furnishing directly to the owner or persons furnishing labor, laborers, or materials used in construction, alteration, improvement, addition to, or repair, either in whole or in part, of any . . . railroad . . . shall have a lien upon the property upon which they have furnished laborers or supplied machinery, tools, or equipment or rendered service or bestowed labor or for which they have furnished materials or mining or milling machinery or other fixtures . . .

C.R.S. § 38-22-101. This statute does not, however, provide that the lien arises when the work is performed or the materials are provided. In fact, as set out in *Wholesale Specialties, Inc. v. Village Homes, Ltd.*, 820 P.2d 1170 (Colo. App. 1991), liens arise when they are perfected:

> The mechanics' liens statutes, . . . , are designed to benefit and protect subcontractors, materialmen, and laborers who are hired to improve or construct structures on the land of another. . . . To be entitled to a lien upon the owner's property, however, the claimant must perfect his lien by filing a lien statement and otherwise complying with § 38-22-109, . . . Until these statutory steps are taken,

> the rights of the lien claimant are merely inchoate.
> Accordingly, a lien does not ripen until it is perfected. . .
> . .
>    Wholesale argues, however, that its liens did 'arise' in
> 1985 because they relate back pursuant to § 38-22-106(1) . .
> . , which states that all 'liens established by virtue of
> this article shall relate back to the time of the
> commencement of work.'  Wholesale's reliance on this statute
> is misplaced for two reasons.
>    First, for there to be a relation back, there must be an
> established lien.  An established lien is one that is
> perfected.

*Id.* at 1173 (citations omitted).  The Defendant, therefore, had no interest in Bowie's property until it filed its lien statement after the commencement of the Debtors' cases, and this attempt to perfect its lien post-petition was a violation of the automatic stay.

The interplay of Bankruptcy Code sections 362(b)(3) and 546(b)(1)(a) is analyzed in detail in *In re 229 Main St. Ltd. P'ship*, 262 F.3d 1(1st Cir. 2001).  There the court acknowledged that the threshold question in this analysis is whether the creditor had a pre-petition interest in the debtor's property.  The court found that the creditor did have such an interest, that section 362(b)(3) was applicable, and that the creditor's act to perfect its lien did not violate the automatic stay.  Having determined here that the Defendant did not have a pre-petition interest in Bowie's property, this court's analysis need proceed no further.  Having perfected its lien post-petition in violation of the automatic stay, the Defendant is not secured and Bowie's transfer to it is avoidable unless some other defense applies.

       d.   <u>The ordinary course of business exception</u>

The Defendant contends that even if the transfers in question meet the criteria of section 547(b), they fall within the ordinary

course of business exception pursuant to section 547(c)(2). That section provides that the trustee may not avoid a transfer to the extent that it was "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; made in the ordinary course of business or financial affairs of the debtor and the transferee; and made according to ordinary business terms." 11 U.S.C. § 547(c)(2)(A)(B)(C). In order to determine if the ordinary course of business defense applies, the court must engage in a "peculiarly factual analysis." *Waldschmidt v. Ranier (In re Fulghum Construction Corp.)*, 872 F.2d 739, 743 (6th Cir. 1989). In order to prevail, the defendant must prove each element of section 547(c)(2) by a preponderance of the evidence.

The application of Bankruptcy Code section 547(c) has been the subject of much debate, and has generated several significant cases from the Sixth Circuit. The requirements for demonstrating the exception were set out in *Logan v. Basic Distrib. Corp. (In re Fred Hawes Org., Inc.)*, 957 F.2d 239 (6th Cir. 1992). A transferee may not use the same standard to prove all the elements of section 547(c)(2). Subsection (A) is demonstrated relatively easily by a showing that each party was engaged in its usual business when the debt was incurred and the transfer took place. Subsection (B) has been determined to be the "subjective" prong, while subsection (C) is the "objective" prong.

The subjective prong requires proof that the transaction between the debtor and the transferee was ordinary as to them; the objective prong requires proof that the transaction was ordinary in relation to standards prevailing in the relevant industry. *See also Jones v.*

*United Sav. and Loan Ass'n (In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.)*, 9 F.3d 680, 682 (8th Cir. 1993)(transferee must prove the three statutory elements by a preponderance of the evidence); *WJM, Inc. v. Massachusetts Dept. of Pub. Welfare*, 840 F.2d 996, 1010-11 (1st Cir. 1988) (each of the three elements must be satisfied by the creditor); *J.P. Fyfe, Inc. v. Bradco Supply Corp.*, 891 F.2d 66, 69 (3rd Cir. 1989) (creditor must prove all three "statutory conjunctive elements"); *Hovis v. Stambaugh Aviation, Inc. (In re Air South Airlines, Inc.)*, 247 B.R. 165 (Bankr. D.S.C. 2000) (Subsections (B) and (C) provide subjective and objective tests which require separate analyses).

The *Fred Hawes* court elaborated on the elements required to establish subsection (B), noting that such a determination required a fact specific analysis as set out in *Fulghum, supra*. The court further noted that in making such an analysis, courts examine several factors, "including timing, the amount and manner a transaction was paid and the circumstances under which the transaction was made." (quoting from *Yurika Foods Corp. v. UPS (In re Yurika Foods Corp.)*, 888 F.2d. 42, at 45 (6th Cir. 1989)). *See also Brown v. Shell Canada, Ltd. (In re Tennessee Chem. Co.)*, 112 F.3d 234, 237 (6th Cir. 1997). As concerns late payments the court stated that a "late payment will be considered 'ordinary' only upon a showing that late payments were the normal course of business between the parties." At 244, citing *Yurika Foods* and *Fulghum*.

As in most cases, subsection (A) is easily satisfied here. Neither party contests the fact that the other was engaged in its usual business when they entered into the Contract. The court will

next consider whether the Defendant can satisfy subsection (B); if not, there is no need to analyze the extent of compliance with subsection (C).

The course of dealing between the Defendant and Bowie was circumscribed by the Contract, and the contractual terms control. As set out above, the Contract called for Bowie to pay 90% of each payment request within 30 days of receipt. Pursuant to the Contract, seven total payments were made within a six-month period. The last two payments were made 35 and 33 days after receipt. "A late payment will be considered 'ordinary' only upon a showing that late payments were the normal course of business between the parties." *In re Fred Hawes Org., Inc.*, 957 F.2d at 244. Further, "[f]ailure to make a payment within the time limit set by the contract is presumptively 'nonordinary.'" *Id.* A long history of dealing between the parties may counteract this result.

The Defendant has recently tendered affidavits of Keith Seiber ("Seiber"), a former officer of Bowie, and Alan Parkerson ("Parkerson"), the vice-president of Parkerson Construction, Inc., a commercial construction business in Colorado. These affidavits are in addition to the affidavit of the Defendant's president, Michael Cunningham, which was attached to the Defendant's motion. Seiber's affidavit states that Bowie retained J.E. Stover & Associates ("Stover"), a mining engineering firm, to design and manage the construction of Bowie's load-out facility. Stover and Seiber drafted the Contract, and Stover served as the project manager once the Contract was awarded. Accordingly, the Defendant would first deliver invoices for payment to Stover for review and approval. Stover would

review the invoices and then give them to the project manager to review.  The invoices would then go to Seiber who would send them out to the Debtors' headquarters in Ashland, Kentucky for payment.  He states that this two-step process could take several days, and that the five and three day delays in the payments at issue were purely incidental to the review process he recites, and the mail.  The court concludes that Seiber's statements raise issues of fact in regard to subsection (B) of section 547(c)(2), particularly since each of the two payments was only a few days late.

Parkerson offers testimony concerning what is considered timely payment in the context of a contract between a mining company and a construction company which addresses the requirements of subsection (C).  Parkerson states in his affidavit that he has been involved in the commercial construction business, including construction for mining operations, for over twenty years.  He further states that based on that experience, payments made by property owners within ten days to two weeks after the due date established by the invoice are not considered untimely.  He states that construction companies like his are asked to first submit invoices to the engineer or architect overseeing the project to review and approve for payment before the invoice is forwarded to the property owner.  He states that such review process will often cause a delay in payment of up to two weeks.  He further states that a delay of two weeks or less is not considered untimely.  The court concludes that Parkerson's statements go toward establishing standards in the industry as required to satisfy subsection (C) of section 547(c)(2).

The Defendant also argues that in any event the Plaintiff should

be estopped from denying that all the payments made to it were made in the ordinary course of business. This contention is based on the fact that the Defendant became a consenting Critical Trade Vendor pursuant to an agreement executed on February 14, 2003. Critical Trade Vendors were those who held Trade Claims, defined in the Debtors' November 14, 2002 Motion to Pay Critical Trade Vendors as claims incurred pre-petition in the ordinary course of business.

The Plaintiff responds that the Defendant's identification as a Critical Trade Vendor only operates to establish the first prong of section 547(c)(2), that the transfers were incurred in the ordinary course of business. The Order Authorizing Debtors to Pay Certain Critical Prepetition Trade Creditors in the Ordinary Course provides in pertinent part that:

> the Debtors are authorized, in their discretion, to pay the Trade Claims of Critical Trade Creditors (as defined in the Critical Trade Creditor Motion) in the ordinary course of their businesses in an aggregate amount not to exceed $35 million (without prejudice to the right of the Debtors to seek further increases in this amount); and it is further
>
> ORDERED, that such payments shall be made to a Critical Trade Creditor (as defined in the Critical Trade Creditor Motion) that agrees (i) to continue to supply goods or services to the Debtors on Customary Trade Terms and (ii) that, if such Critical Trade Creditor later refuses to supply goods or services to the Debtors on Customary Trade Terms during these case, then on motion by the Debtors and with the Court's approval (a) any payments on account of Trade Claims made by the Debtors to, or received by, such Critical Trade Creditor after the date on which these cases were filed (the "Petition Date") shall be deemed to be postpetition advances recoverable by the Debtor from such Critical Trade Creditor in cash or additional goods or services, and (b) any such Trade Claims of such Critical Trade Creditor paid after the Petition Date shall be reinstated as a prepetition debt;

Bowie and the Defendant entered into an agreement pursuant to which the Defendant would be classified as a Critical Trade Creditor, but

this agreement was in relation to the retention amount still owed on the Contract, $237,528.00.  This agreement did not address the pre-petition payments already made under the Contract.  Further, the language "in the ordinary course of their businesses" defines the circumstances of the Debtors' making **post-petition payments** to Critical Trade Creditors on **pre-petition claims**; it does not define a defense in regard to pre-petition payments.  The court therefore agrees with the Plaintiff that the Defendant's status as a Critical Trade Creditor is not sufficient to satisfy subsections (B) and (C) of section 547(c)(2).

In consideration of all of the foregoing, the issues having been narrowed, the court concludes that while the Defendant has not demonstrated that it is entitled to judgment as a matter of law, it has raised sufficient issues of fact in regard to Bankruptcy Code section 547(c)(2) to allow this matter to go on to trial.  Based on the affidavits the Defendant has tendered, it may very well be able to develop sufficient facts at trial to satisfy all elements of section 547(c)(2), and avail itself of the ordinary course defense.  The Defendant's Motion for Judgment on the Pleadings or in the Alternative for Summary Judgment should be overruled, and the court will do so by separate order.

Copies to:

Sarah Charles Wright, Esq.
Derek L. Wright, Esq.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
*The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.*



**Signed By:**
*William S. Howard*
**Bankruptcy Judge
Dated: Monday, May 02, 2005
(wsh)**